UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKUS HEITKOETTER, an individual, and ROCKWELL TRADING SERVICES, LLC, a Texas Limited Liability company,<br><br>Plaintiffs,<br><br>v.<br><br>KARL DOMM, an individual,<br><br>Defendant. | No.  1:22-cv-00368-KES-BAM<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Doc. 136 |
| KARL DOMM, an individual,<br><br>Counterclaimant,<br><br>v.<br><br>MARKUS HEITKOETTER, an individual, and ROCKWELL TRADING SERVICES, LLC, a Texas Limited Liability company,<br><br>Counterclaim-Defendants. | ORDER DENYING PLAINTIFFS' (COUNTERCLAIM-DEFENDANTS') MOTION TO STRIKE EXPERT TESTIMONY AND DENYING PLAINTIFFS' (COUNTERCLAIM-DEFENDANTS') MOTION FOR SUMMARY JUDGMENT<br><br>Docs. 137, 138 |

Plaintiffs (and counterclaim-defendants) Markus Heitkoetter and Rockwell Trading

Services, LLC, proceed in this action against defendant (and counterclaimant) Karl Domm on

their third amended complaint ("TAC") for defamation by implication, defamation (libel and per

1

se libel), intentional interference with prospective economic advantage, deceptive trade practices, and abuse of process. *See* Doc. 60; *see also* Doc. 86 (granting in part and denying in part defendant's motion to dismiss TAC). Defendant proceeds on a counterclaim against plaintiffs for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code. § 17200 *et seq*. Defendant moves for partial summary judgment on certain claims in plaintiffs' TAC. Doc. 136. Plaintiffs move to strike the testimony and report of defendant's consumer survey expert, Doc. 137, and move for summary judgment on defendant's counterclaim, Doc. 138. For the reasons set forth below, defendant's motion for partial summary judgment on plaintiffs' TAC is granted in part and denied in part, and plaintiffs' motion to exclude expert testimony and motion for summary judgment on defendant's counterclaim are denied.

## I.    BACKGROUND

Heitkoetter is the owner and founder of Rockwell Trading, LLC. Doc. 136-2 at 2. Both defendant and plaintiffs operate channels on www.youtube.com ("Youtube") where they publish videos about online trading. *Id.* The parties are in the "same zone of interest" in the trading industry: online trading education. *Id.* The parties "sell products," "market themselves," "offer the service of coaching individuals for trading," and "showcase their products and services on their Youtube channels." *Id.* There are hundreds of online traders on Youtube. April 10, 2024 Domm Dep. 145:7–9.

In late 2020 and early 2021, defendant and plaintiffs arranged for defendant to perform an "unbiased" review of plaintiffs' "Power X Optimizer" software, a trading software that plaintiffs sold and that allowed users to utilize different trading strategies including plaintiffs' "wheel strategy." *See* Doc 136-4, Exs. A–C, at 6–11; *see also* April 10, 2024 Domm Dep. 88:6–89:14; July 19, 2024 Heitkoetter Dep. 75:10–76:10. In one email to plaintiffs during this exchange, defendant stated "Just a heads up. I have given a positive review only on the people that share their P&L . . .." *Id.*, Ex. A, at 7.[1] Defendant subsequently published six videos on Youtube

---

[1] "P&L" refers to "profit and loss." *See, e.g.*, April 10, 2024 Domm Dep. at 90:4–7; July 19, 2024 Heitkoetter Dep. 122:17–123:18.

1  reviewing plaintiffs' Power X Optimizer software.  *See, e.g.*, Doc. 143-1 at 5 ¶ 3 (citing April 10,

2  2024 Domm Dep. at 82:23–84:15).

3          About a year later, on January 21, 2022, defendant published a video on Youtube entitled

4  "37 Things Markus Heitkoetter/Rockwell Trading Is Hiding From You" ("37 Things Video").

5  Doc. 136-5 at 2.  In the 37 Things Video, defendant makes several statements criticizing

6  plaintiffs' trading products and success, including statements criticizing plaintiffs' wheel strategy

7  and contending Heitkoetter lost money on his own trading accounts using the wheel strategy,

8  claiming that he proved the Power X Optimizer software did not work over a one year period, and

9  asserting that plaintiffs lost their portfolio margin status due to lack of funds on a particular

10  account in 2021.  *See id.*; *see also* Doc. 143-1 ¶ 7–11.[2]

11         On March 29, 2022, plaintiffs filed a complaint generally alleging that defendant made

12  defamatory statements about plaintiffs and their products and services in the 37 Things Video.

13  Doc. 1.  On November 7, 2022, the Court granted defendant's motion to dismiss the complaint for

14  failure to state a claim, finding that plaintiffs' allegations as to allegedly defamatory statements

15  were too general and interpretive, and granted plaintiffs leave to amend.  Doc. 20.[3]  On

16  November 28, 2022, plaintiffs filed a first amended complaint.  Doc. 21.

17         On December 10, 2022, defendant published another video to Youtube titled "I

18  Subpoenaed Rockwell Trading's Markus Heitkoetter's Trading Statements" ("Trading Statements

19  Video").[4]  Doc. 136-5 at 2.  The thumbnail for the Trading Statements Video depicts the word

20  _____

21  [2] The individual statements in the 37 Things Video that plaintiffs contend are defamatory are
    listed in plaintiffs' response to defendant's interrogatories.  *See* Doc. 136-4, Ex. L, at 63–64 &

22  Ex. M, at 70–71.

23  [3] The Court denied defendant's motion to strike plaintiffs' complaint under California's Anti-
    SLAPP statute, finding that defendant's speech was subject to the statute's commercial speech

24  exception.  *See* Doc. 20.

25  [4] While defendant's motion to strike and motion to dismiss were pending, plaintiffs and defendant
    engaged in informal discovery, in which plaintiffs produced to defendant financial information

26  regarding plaintiffs' trading accounts.  Doc. 143-1 at 7 ¶ 14 (citing Doc. 143-2 ¶¶ 4–5).  On
    December 16, 2022, plaintiffs moved the Court for a protective order preventing disclosure of

27  information produced through the discovery process, including sensitive financial information.

28  Doc. 22.  The Court granted the motion on January 6, 2023, and entered an interim protective

1    "BUSTED !!" affixed over a picture of what appears to be a subpoena, which shows the words

2    "UNITED STATES DISTRICT COURT," and images of defendant and Heitkoetter.  *Id.*; *see also*

3    Doc. 85 at 13.  In the Trading Statements Video, defendant shows clips from plaintiffs' Youtube

4    videos in which Heitkoetter states that it is reasonable for traders to expect profit gains of

5    between 60% and 800% from trading per year and that Heitkoetter has profit gains from trading

6    within that range.  Doc. 136-5 at 2.  Then defendant discloses some of the financial information

7    regarding plaintiffs' trading accounts from 2019 to 2021 that he obtained through the parties'

8    informal discovery, *see supra* n.4, which defendant claims demonstrates that plaintiffs did not

9    achieve 60% or more in profit gains, but in fact, when considering plaintiffs' unrealized losses,

10   lost thousands of dollars from 2019 to 2021.  Doc. 136-5 at 2.  Finally, toward the end of the

11   Trading Statements Video, defendant states he "might release another video about what really

12   happened with Marcus's 2021 $500,000 Tasty Works public wheel trading account," noting

13   viewers "are in for seven shocking secrets about that account" and stating that viewers should

14   "[b]e sure to subscribe to [defendant's Youtube] channel and hit the notification bell so you don't

15   miss the video."  *Id.*

16          On December 18, 2022, defendant moved to dismiss the first amended complaint,

17   Doc. 23, and on December 22, 2022, plaintiffs moved to amend the first amended complaint to

18   include causes of action related to the Trading Statements Video, Doc. 26.  The Court granted the

19   motion to amend on January 5, 2023.  Doc. 32.  On January 5, 2023, plaintiffs filed a second

20   amended complaint alleging false light, defamation by implication, defamation (libel and libel per

21   se), intentional interference with prospective economic advantage, and deceptive trade practices.

22   Doc. 34.[5]  On January 19, 2023, defendant moved to dismiss certain claims in the second

23   _____

24   order, Doc. 34, and entered a final protective order on February 16, 2023, Doc. 43.  The Court's
     orders did not require that defendant remove the Trading Statements Video from Youtube but
25   ordered that moving forward neither party "shall publish to the Internet" any discovery materials.
     *See* Docs. 34, 43.  The Court's order indicated that its grant of a protective order did "not
26   preclude either party from publishing information that is independently acquired outside of the
     discovery process or is admitted into evidence at trial and thereby becomes part of the public
27   record."  Doc. 34 at 13.

28   [5] The second amended complaint mooted defendant's motion to dismiss the first amended

amended complaint.  Doc. 36.  On March 17, 2023, the Court granted defendant's motion in part as to the false light claim but denied it otherwise.  Doc. 44.

On April 6, 2023, defendant filed a counterclaim against plaintiffs alleging false advertising under the Lanham Act and violations of the UCL.  Doc. 46.  Specifically, defendant alleges plaintiffs make six false and misleading statements in their Youtube videos and on their website that they use to advertise their products.[6]  *Id.*

On April 16, 2023, defendant published a third video to Youtube entitled "Markus Heitkoetter/Rockwell Trading Sued for False Advertising: 7 Shocking Allegations" ("Counterclaim Video").  Doc. 143-2 ¶ 7, Ex. A-2.  In the Counterclaim Video, defendant discusses his own services and process of reviewing other financial trading educational programs, informs the viewer that he was being sued by plaintiffs' in this case, and states that "Markus [Heitkoetter] used the legal system to keep his trading statements private" and that the Court ruled in this case that defendant "can discuss anything that is part of the public record."  *Id.*  Defendant said, "[w]ith that in mind, I discovered some interesting information about Markus Heitkoetter," and he then discussed several documents regarding Heitkoetter, including a federal tax lien, a mechanic's lien, and a civil complaint filed against Heitkoetter in Ohio accusing him of fraud.  *Id.*  Defendant asked viewers to inform him if they had any further information regarding these documents and to "make sure [he] didn't miss anything or was inaccurate in any way."  *Id.*  Defendant then discussed eight of his allegations from his counterclaim while showing either the counterclaim or related images.  *Id.*

On April 27, 2023, plaintiffs filed a motion to amend the second amended complaint to include allegations related to the Counterclaim Video.  Doc. 51.  The Court granted the motion to amend on May 22, 2023, Doc. 59, and plaintiffs filed the TAC the same day, Doc. 60.  The TAC added a claim of abuse of process and alleged that defendant filed the counterclaim and published

complaint.  Doc. 35.

---

[6] The individual statements which defendant contends are false or misleading are listed in defendant's counterclaim, *see* Doc. 46 ¶¶ 26–28, 39, 98, 100, and are discussed below, *see infra* section III.C.

1    the Counterclaim Video to circumvent the protective order issued in this case.  Doc. 60; *see also*

2    *supra* n.4.

3          On June 12, 2023, defendant moved to dismiss certain claims in the TAC for failure to

4    state a claim and moved to strike portions of the TAC under California's Anti-SLAPP statute.

5    Doc. 63.  The parties consented to magistrate judge jurisdiction for the limited purpose of hearing

6    defendant's motion to dismiss.  Docs. 65, 66.  On January 29, 2024, the magistrate judge granted

7    in part and denied in part defendant's motion.  Doc. 86.  Specifically, the magistrate judge held

8    that "[d]efendant's motion to dismiss based upon the litigation privilege and fair and true report

9    privilege is GRANTED with respect to [d]efendant's statements regarding his counterclaim in the

10    Counterclaim Video."  *Id.* at 29.  Otherwise, defendant's motion was denied.  *Id.*

11          The case was reassigned to the undersigned on March 14, 2024.  Doc. 95.  On March 31,

12    2025, defendant moved for partial summary judgment as to plaintiffs' abuse of process claim and

13    plaintiffs' claims arising from the 37 Things Video and Trading Statements Video.  Doc. 136.[7]

14    The same day plaintiffs moved to strike the testimony and expert report of defendant's consumer

15    survey expert, Travis Tae Oh, Ph.D., Doc. 137, and moved for summary judgment on defendant's

16    counterclaim, Doc. 138.  Plaintiffs opposed defendant's motion for partial summary judgment,

17    Doc. 143, and defendant replied, Doc. 150.  Defendant also opposed defendants' motions

18    (Docs. 141, 142), and plaintiffs replied (Docs. 147, 148).

19          This case is set for a bench trial on October 21, 2025.  Doc. 131.

20    **II.  LEGAL STANDARD**

21          Summary judgment is appropriate if "there is no genuine dispute as to any material fact

22    and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

---

[7] In conjunction with his motion, defendant requests judicial notice of the complaint in *Markus Heitkoetter and Rockwell Trading Services, LLC v. John Does*, Case No. D-1-GN-22-000779 (Tex. Dist. Ct.) (complaint filed Feb. 15, 2022), which plaintiffs brought against several Doe defendants alleging that comments those defendants published regarding plaintiffs' Youtube videos were defamatory.  *See* Doc. 136-6.  Plaintiffs do not oppose defendant's request for judicial notice.  *See generally* Doc. 143.  The complaint in that case is a matter of public record and is therefore properly the subject of judicial notice as to the existence of the complaint, but not the truth of the allegations contained therein.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).  Defendant's request is therefore granted.

1    "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Momox-Caselis*

2    *v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) (internal quotations omitted) (citing *Anderson v.*

3    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is "material" if it "might affect the

4    outcome of the suit under the governing law." *Anderson*, 477 U.S. at 841.

5    "A party seeking summary judgment bears the initial burden of informing the court of the

6    basis for its motion and of identifying those portions of the pleadings and discovery responses [if

7    any] that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty*

8    *Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317,

9    323 (1986)).  Where "the nonmoving party will have the burden of proof [at trial], the movant can

10    prevail merely by pointing out that there is an absence of evidence to support the nonmoving

11    party's [claim]" or by citing evidence in the record that negates the nonmoving party's claims.

12    *See id.* (citing *Celotex Corp.*, 477 U.S. at 323).  If the moving party meets its initial burden, the

13    burden shifts to the nonmoving party to produce evidence in the record supporting its claims or

14    defenses and "establish that there is a genuine issue of material fact." *Matsushita Elec. Indus. Co.*

15    *v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).

16    The Court must view the record in the light most favorable to the nonmoving party and

17    draw reasonable inferences in that party's favor.  *Id.* at 587–88.  In the endeavor to establish the

18    existence of a factual dispute, the opposing party need not establish a material issue of fact

19    conclusively in its favor.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,

20    630 (9th Cir. 1987).  It is sufficient that "the claimed factual dispute be shown to require a jury or

21    judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 252

22    (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  However, the

23    nonmoving party "must do more than simply show that there is some metaphysical doubt as to the

24    material facts." *Matsushita*, 475 U.S. at 586 (citation omitted). "The mere existence of a scintilla

25    of evidence in support of the [nonmovant's] position" is insufficient to survive summary

26    judgment. *Anderson*, 477 U.S. at 252.

27    "If the nonmoving party fails to produce enough evidence to create a genuine issue of

28    material fact, the moving party wins the motion for summary judgment.  But if the nonmoving

7

1   party produces enough evidence to create a genuine issue of material fact, the nonmoving party

2   defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,

3   1103 (9th Cir. 2000) (citing *Celotex Corp.*, 477 U.S. at 322).

4   **III.   ANALYSIS**

5       **A.   <u>Defendant's Motion for Partial Summary Judgment on TAC</u>**

6           **1.   37 Things Video**

7         Defendant argues that plaintiffs are limited-purpose public figures, and therefore, actual

8   malice is required for defendant's statements in the 37 Things Video to be considered defamatory.

9   Doc. 136 at 4–9.  Defendant contends that there is not a triable issue of fact as to whether

10   defendant made the speech in the 37 Things Video with actual malice, and thus, summary

11   judgment on plaintiffs' claims for defamation, intentional interference with prospective economic

12   advantage, and deceptive trade practice related to the 37 Things Video is warranted.  Doc. 136

13   at 4–9.  Plaintiffs contest that they are limited-purpose public figures and argue that, even if they

14   are, there is a material dispute of fact regarding actual malice.  Doc. 143 at 8–21.

15         The state has "strong and legitimate" interest in compensating private individuals and

16   entities for injuries to their reputations but only a "limited" interest in compensating public

17   figures for such injuries.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343, 348–49 (1974).

18   There are multiple types of public figures—all purpose public figures and limited purpose public

19   figures.  *See, e.g.*, *Makaeff v. Trump University, LLC*, 715 F.3d 254, 265 (9th Cir. 2013) (citing

20   *Gertz*, 418 U.S. at 345).[8]  Limited purpose public figures are individuals or entities who

21   voluntarily "thrust[] themselves to the forefront of particular public controversies in order to

22   influence the resolution of the issues involved."  *Id.* (citing *Gertz*, 418 U.S. at 345).  Because

23   "such persons assume special prominence in the resolution of public questions," speech that is

24   critical of them is subject to heightened constitutional protections—that is, allegedly defamatory

25   statements must be made with actual malice.  *Id.* (citing *Gertz*, 418 U.S. at 351).  The Ninth

26   Circuit in *Makaeff* reiterated the policy reasons for this requirement: "public figures enjoy greater

27

28   [8] The parties do not argue that plaintiffs are all purpose public figures.  *See generally*
Docs. 136-1, 143, 150.

access to the channels of effective communication than private individuals, and are therefore better able to contradict the lie or correct the error" and the normative consideration that "public figures became such by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention." *Id.* (internal quotations and citations omitted).

"[T]he limited public figure analysis [is] a pure constitutional question" and is "not a matter of state substantive law." *Id.* at 270. "The determination of whether a party is a public figure, or a limited purpose public figure, is an issue of law to be decided by the court." *See, e.g.*, *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F. Supp. 3d 1108, 1129 (D. Nev. Aug. 13, 2014). As the moving party, defendant bears the burden of showing plaintiffs are limited purpose public figures. *See, e.g.*, *Unsworth v. Musk*, Case No. 2:18-cv-08048-SVW-JC, 2019 WL 8220721, at *4 (C.D. Cal. Nov. 18, 2019) (citation omitted).

To determine whether an individual or entity is a limited purpose public figure, the Court "examine[s] the nature and extent of [the individual or entity's] 'participation in the particular controversy giving rise to the defamation.'" *Makaeff*, 715 F.3d at 266 (citing *Gertz*, 418 U.S. at 352). "In undertaking this inquiry, [the Court] consider[s] whether (i) a public controversy existed when the [allegedly defamatory] statements were made, (ii) whether the alleged defamation is related to the plaintiff's participation in the controversy, and (iii) whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution." *Id.* (citations omitted).

Defendant argues that plaintiffs are limited purpose public figures because (1) plaintiffs' Youtube videos have a comment section which "invites attention and comment" from the public; (2) plaintiffs invited defendant's criticism by agreeing to a review of plaintiffs' services by defendant, especially given defendant's warning (that is, the "heads up") that defendant only provides good reviews for those who show their "P&L";[9] (3) plaintiffs involve themselves in direct criticism regarding their transparency and trading success by responding to comments on

---

[9] None of defendant's review videos are at issue in this litigation. Rather, defendant argues that plaintiffs' agreement to defendant's review and defendant's "heads up" warning extended to the subsequently made 37 Things Video.

9

1  those topics on their Youtube videos; and (4) plaintiffs' TAC and website state that Heitkoetter is

2  successful and well-respected in his field and has been a successful trader for more than 25 years.

3  Doc. 136-1 at 4–7.

4      Defendant has not met its burden to demonstrate that plaintiffs are limited purpose public

5  figures.  Defendant largely relies on *Makaeff v. Trump University*, 715 F.3d 254, and *Planet Aid,*

6  *Inc. v. Reveal*, 44 F.4th 918 (9th Cir. 2022), to argue that plaintiffs voluntarily injected

7  themselves into a public controversy regarding plaintiffs' transparency, truthfulness, and success

8  as a trader.[10]  Doc. 136-1 at 4–7; Doc. 150 at 3–4.  These two cases demonstrate that "large scale,

9  aggressive advertising can inject a person or entity into a public controversy that arises from the

10  subject of that advertising," as it "can be a way of voluntarily exposing the company to increased

11  risk of injury from defamatory falsehood concerning the company and its advertised products."

12  *Makaeff*, 715 F.3d at 267–68; *see also Planet Aid, Inc.*, 44 F.4th at 926 ("voluntariness

13  requirement has been interpreted broadly, both by *Makaeff* and by other courts" and

14  "voluntariness can . . . be satisfied by a showing that a person or entity engaged in a course of

15  conduct that foreseeably put themselves at risk of public scrutiny with respect to a limited range

16  of issues").

17      Unlike here, where the allegedly defamatory statements about plaintiffs were made by a

18  business competitor, *Makaeff* involved allegedly defamatory statements about Trump University

19  made by a former customer of Trump University.  *See Makaeff*, 715 F.3d at 258.  The Ninth

20  Circuit relied on a Third Circuit decision—*Steaks Unlimited v. Deaner*—to conclude that Trump

21  University was a limited purpose public figure for the purposes of the controversy regarding the

22  legitimacy of its educational practices given that it "conducted an aggressive advertising

23  campaign in which it made controversial claims about its products and services," and because

24  prior to the alleged defamatory remarks by *Makaeff*, it had specifically denied practices that were

---

25  [10] Though defendant's arguments in his briefing focus mostly on the third element, it is also

26  doubtful whether defendant has adequately shown the first two elements, including whether a
   "public controversy," as defined by the Ninth Circuit, existed regarding these matters, whether

27  that controversy existed prior to the 37 Things Video, and whether defendant's allegedly
   defamatory statements in the 37 Things Video related to plaintiffs' participation in that

28  controversy.

1    the topic of those defamatory remarks.  *Id.* at 268–69 (citing *Steaks Unlimited*, 623 F.2d 264 (3d

2    Cir. 1980)).  However, the Ninth Circuit noted in *Makaeff* that "[t]he Third Circuit has refused to

3    extend the principle [that an aggressive advertising campaign can constitute voluntary injection

4    into a controversy] to cases involving defamatory advertisements *by competitors*."  *Id.* at 268 n.9

5    (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila*, 898 F.2d 914, 98–39 (3d Cir. 1990)

6    (emphasis added).  Rather, it explained that *Steaks Unlimited* "involved a consumer reporter's

7    statement," which "merited stronger [constitutional] protection than commercial advertising,"

8    which was at issue in *U.S. Healthcare*.  *Id.*  Here, the allegedly defamatory statements regarding

9    plaintiffs were made in an advertisement by defendant, who is plaintiffs' competitor—the factual

10   situation that the Ninth Circuit took care to note may require distinct treatment from the

11   framework set forth in *Makaeff* and *Steaks Unlimited*, consistent with the Third Circuit's ruling in

12   *U.S. Healthcare*.[11]

13         In *U.S. Healthcare*, one healthcare entity had used advertising "to help establish itself as a

14   leading provider of healthcare."  898 F.2d at 938.  Then a competing healthcare entity "began the

15   comparative advertising war with its pointed attacks" on the first entity.  *Id.*  The first entity

16   responded with its own comparative advertising.  *Id.*  The Third Circuit found that the companies,

17   in "attempting to influence consumers' decisions, have thrust themselves into the controversy of

18   who provides better value in health care delivery and insurance."  *Id.*  It noted that "by inviting

19   comment and assuming the risk of unfair comment, both claimants resemble public figures."  *Id.*

20   Specifically, the court noted that "[u]nder traditional defamation analysis, the parties'

21   considerable access to the media and their voluntary entry into a controversy are strong indicia

22   that they are limited purpose public figures."  *Id.*  However, the Court ultimately concluded that

23

24   _____

     [11] Though defendant's 37 Things Video does not explicitly compare defendant's competing

25   products with plaintiffs' products, the video still constitutes comparative advertising, as the Court
     previously found.  *See* Doc. 20 at 11–12 (finding defendant's speech in the 37 Things Video was

26   commercial speech for purposes of California's Anti-SLAPP statute given that "the parties were
     competitors" and "the evidence . . . shows that [d]efendant was using [p]laintiffs and their

27   offerings as a foil to promote his supposedly 'proprietary' version of the 'wheel' investment
     program and to drive the sale of related products").

28

1    the healthcare entities were not limited purpose public figures and that heightened constitutional

2    protections did not apply to the allegedly defamatory speech about them.  *Id.* at 938–39.

3        The Court found that "[a]lthough some of the advertisements touch on matters of public

4    concern, their central thrust is commercial," and "[t]hus, the parties have acted primarily to

5    generate revenue by influencing customers, not to resolve 'the issues involved.'"  *Id.* at 939.

6    More "fundamental" to the court's conclusion, the court noted that "most advertisers . . . seek out

7    the media."  *Id.*  "Thus, it will always be true that such advertisers have voluntarily placed

8    themselves in the public eye" and "[i]t will be equally true that such advertisers have access to the

9    media."  *Id.*  "Therefore, under the *Gertz* rationale speech of public concern that implicates

10   corporate advertisers . . . will always be insulated behind the actual malice standard."  *Id.*  For this

11   reason, the Third Circuit found that in such cases an entity "must do more . . . to become a limited

12   purpose public figure."  *Id.*

13       Like the parties in *U.S. Healthcare*, plaintiffs here advertised and published statements

14   regarding Heitkoetter's alleged success and experience in his field, and defendant published a

15   video criticizing plaintiffs' services and products, which constituted comparative advertising.  *See*

16   *id.* at 938.  Also like in *U.S. Healthcare*, both parties have voluntarily placed themselves in the

17   public eye, both have access to the media, and a substantial motivation of the parties' conduct

18   appears to be "to generate revenue by influencing customers, not to resolve 'the issues

19   involved.'"  *See id.* at 939.  However, like in *U.S. Healthcare*, defendant must demonstrate that

20   plaintiffs have "do[ne] more" to become limited purpose public figures beyond having greater

21   access to the media than the general public and placing themselves in the public eye.  *See id.*

22   Defendant has failed to do so.[12]

23       Plaintiffs did not voluntarily inject themselves into a controversy and become limited

24   purpose public figures by allowing the public to post comments regarding plaintiffs' videos on

25   Youtube, and by publishing on their website that they are experienced and well-respected.  If such

---

[12] To show that plaintiffs are limited purpose public figures, defendant would also have to show that the first two elements of the *Makaeff* test—that a public controversy existed at the time of the 37 Things Video and that defendant's statements were related to plaintiffs' participation in such controversy—are met.

1  actions sufficed, then every person who posts a video on Youtube and allows comments or who

2  has a website advertising their services and qualifications would be a limited purpose public

3  figure.  *See Wisk Aero LLC v. Archer Aviation Inc.*, Case No. 3:21-cv-02450-WHO, 2023 WL

4  3919469, at *11 (N.D. Cal. June 9, 2023) ("merely participating in a business or market [does

5  not] render[] that participant . . . a public figure") (citing *Makaeff*, 715 F.3d at 267; then citing

6  *Carver v. Bonds*, 37 Cal. Rptr. 3d 480, 501 (Cal. App. Ct. 2005)).

7        To the extent defendant argues that plaintiffs' agreement to have their products reviewed

8  by defendant shows plaintiffs' voluntary interjection into a controversy regarding the quality of

9  their products and services (especially given that defendant gave plaintiffs a "heads up" that he

10  only provides "good" reviews to individuals who disclose their "P&L"), the review videos

11  defendant published to Youtube are not the subject of this lawsuit.  Defendant makes the

12  conclusory argument that plaintiffs' agreement to the review and defendant's "heads up" notice

13  carry on to the 37 Things Video that defendant subsequently published because the statements in

14  the 37 Things Video "go to the unbiased review."  Doc. 136-1 at 5.  However, the 37 Things

15  Video was published almost a year after the review videos were published.  Plaintiffs' agreement

16  to a specific review over a year earlier did not convert plaintiffs into limited purpose public

17  figures for purposes of defendant's actions a year later.

18        Defendant attaches as an exhibit to his motion a portion of the comment section on one of

19  plaintiffs' Youtube videos which shows plaintiffs reacting to comments regarding their

20  transparency and trading success.  Doc. 136-4, Ex. D, at 12–27.  Even if plaintiffs' response to

21  such comments could be considered voluntarily inserting themselves into a public controversy

22  regarding such matters, which is not clear, defendant has not shown that any such controversy

23  existed *prior to* the allegedly defamatory statements defendant made in the 37 Things Video—the

24  first element of the limited purpose public figure test.  Defendant would need to show that the

25  comments predated the 37 Things Video, which he published on January 22, 2022.  The

26  comments do not bear specific dates; rather, they each bear the general time stamp of "2 years

27  ago."  *Id.*  Given that the exhibit showing the comments is dated July 8, 2024, the evidence

28  produced therefore indicates that the comments were posted sometime around July 8, 2022.

1    Based on this, defendant has not shown that the comments predated the 37 Things Video.

2            Nor does the complaint in *Heitkoetter v. Does*, Case No. D-1-GN-22-000779 (Tex. Dist.

3    Ct.), in which plaintiffs sued several people for posting allegedly defamatory comments about

4    plaintiffs and their services on Youtube, demonstrate that a controversy regarding plaintiffs'

5    transparency regarding their trading program existed prior to defendant's 37 Things Video.  *See*

6    Doc. 136-1 at 8; Doc. 136-6; Doc. 143 15 n.8.  Though that complaint's allegations show that,

7    prior to the publication of the 37 Things Video, a handful of comments were published regarding

8    plaintiffs' transparency about their unrealized losses, *see* Doc. 136-6 at ¶¶ 14–17, the majority of

9    such comments were posted *after* the 37 Things Video was published, and in fact, were posted in

10   response to the 37 Things Video, *see* Doc. 136-6 ¶¶ 18–26.  And "a defamation defendant cannot

11   create a defense by creating a controversy from the content of defamatory statements." *Mosesian*

12   *v. McClatchy Newspapers*, 285 Cal. Rptr. 430, 440 (Cal. App. Ct. 1991) (citing *Hutchinson v.*

13   *Proxmire*, 443 U.S. 111, 135 (1979)).[13]

14           Defendant has not met its burden to show that a public controversy existed at the time

15   defendant published the 37 Things Video, that the alleged defamation in this case is related to

16   plaintiffs' participation in a pre-existing controversy, and that plaintiffs voluntarily injected

17   themselves into that controversy for the purpose of influencing the controversy's ultimate

18   resolution.  Defendant therefore has not met his burden to prove that plaintiffs are limited purpose

19   public figures.[14]  Because defendant has not shown that plaintiffs are limited purpose public

20   _____

21   [13] Defendant also argues briefly in its reply that plaintiffs were sued for "fraud, fraud in the
     inducement, and civil conspiracy" in 2019, which demonstrates that a public controversy existed
22   regarding plaintiffs' "credibility, trustworthiness, and transparency" prior to the 37 Things Video.
     Doc. 150 at 2, 4–5.  A review of the complaint indicates that the action is based on an alleged
23   breach of contract regarding an agreement to sell interests in an entity.  Doc. 1-1, *Life Changing*
     *Events, LLC v. Heitkoetter*, 5:19-cv-02057 (N.D. Ohio, Sept. 9, 2019); *see also Lee*, 250 F.3d at
24   688–89 (matters of public record properly the subject of judicial notice).  This does not show that
     a public controversy existed as to the allegedly defamatory statements at issue in the 37 Things
25   Video—namely regarding plaintiffs' transparency about plaintiffs' unrealized losses and margin
     status and whether plaintiffs' trading products work.
26

27   [14] The Court previously determined, at the motion to dismiss stage, that defendant had also not
     met its burden then to demonstrate that plaintiffs were limited purpose public figures.  *See*
28   Doc. 20 at 14 n.10 ("[T]he statements at issue here (which pertain solely to purported deficiencies

14

figures, defendant has not shown that the actual malice standard applies to his speech. Accordingly, at trial, plaintiffs will not have to show that defendant acted with actual malice.

As defendant's argument for summary judgment as to plaintiffs' claims related to the 37 Things Video was based solely on his contention that there was no triable issue of fact regarding actual malice, summary judgment as to plaintiffs' claims related to the 37 Things Video—that is, defamation, intentional interference with prospective economic advantage, and deceptive trade practice—is denied.

### 2. Trading Statements Video

Defendant also contends that summary judgment is warranted as to plaintiffs' claims for defamation, intentional interference with prospective economic advantage, and deceptive trade practice related to the Trading Statements Video. Doc. 163-1 at 9–12. To prevail on their claim for defamation by implication under California law, plaintiffs must show that "(1) [their] interpretation of [a] statement is reasonable; (2) the implication or implications to be drawn convey defamatory facts, not opinions; (3) the challenged implications are not 'substantially true'; and (4) the identified reasonable implications could also be reasonably deemed defamatory." *Issa v. Applegate*, 242 Cal. Rptr. 3d 809, 824 (Cal. App. Ct. 2019) (quoting *Heller v. NBC Universal, Inc.*, CV-15-09631, 2016 WL 6583048, at *3–4 (C.D. Cal., June 29, 2016)) (cleaned up).[15]

---

and irregularities in [p]laintiffs' investment offerings) are plainly about [p]laintiffs' 'specific business practices,' and Defendant has not plausibly demonstrated a meaningful 'functional relationship' (or the requisite 'degree of closeness'), between his alleged attacks on [p]laintiffs and a 'public conversation' about a 'matter of public interest.' The purpose of Defendant's statements, as alleged, is apparently to steer potential customers away from Plaintiffs and to himself." (citations omitted)).

[15] Defendant's contention that he is entitled to summary judgment on any claim related to the Trading Statements Video because plaintiffs have not specified what statements are at issue for the Trading Statements Video is unconvincing. Doc. 136-1 at 9 (citing Doc. 136-3 at 3 ¶ 7). The Court's March 17, 2023 order noted that plaintiff proceeds on a defamation by implication claim regarding the Trading Statements Video "show[ing] a picture of [d]efendant and Heitkoetter with the word 'BUSTED' across [the] middle" and containing "verbal teasers" regarding "what really happened with [Heitkoetter's] 2021 $500,000 Tasty Works public wheel trading account" and "seven shocking secrets about [Heitkoetter's] account," given they "invite a reasonable, factual inference that Heitkoetter's investment performance was not as good as he claimed and that he lied about his investment performance in order to promote sales of his flawed investment program." Doc. 44 at 8–10.

1    Defendant contends that summary judgment is warranted because the term "busted" is

2    inactionable rhetorical hyperbole.  Doc. 136-1 at 10.  "Statements that cannot reasonably be

3    interpreted as stating actual facts about an individual are protected."  *Milkovich v. Lorain Journal*

4    *Co.*, 497 U.S. 1, 1, 20 (1990) (citation omitted).  "This provides assurance that public debate will

5    not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has

6    traditionally added much to the discourse of our Nation."  *Id.* at 20 (citation omitted).  A relevant

7    question is whether the allegedly defamatory statement is the "sort of loose, figurative, or

8    hyperbolic language which would negate the impression that [a defendant] was seriously

9    maintaining" that the defamatory information that the language states or implies is actually true.

10   *Id.* at 21.  Another relevant question is whether the subject of the allegedly defamatory statements

11   is capable of being proven true or false.  *See id.*

12   Defendant's argument is essentially that no reasonable viewer of the Trading Statements

13   Video would understand defendant to have been stating *as fact* that plaintiffs had been "busted"

14   by defendant.  However, as noted, the Court previously found that the word "busted" in

15   combination with the verbal teasers regarding about Heitkoetter's accounts could lead a

16   reasonable viewer of the Trading Statements Video to make the factual inference that

17   Heitkoetter's investment performance was not as good as he claimed, that he lied about his

18   investment performance in order to promote sales of his flawed investment program, and that

19   defendant caught him in his lie.  *See* Doc. 44 at 8–10 (emphasis added).

20   There is at least a material dispute as to whether defendant's intent in publishing the

21   Trading Statements Video was to impart this exact message to his audience.  *See* Doc. 136-5 at 2.

22   Defendant begins the video by stating that the Trading Statements Video "will get into some

23   details on the *real* trading results for [Heitkoetter's accounts from] . . . 2019, 2020, and 2021."

24   *Id.*  He explains that "[his] goal is to get anyone claiming trading success and using that to sell

25   [trading] courses to prove they're credible and [he's] only found one way to prove credibility and

26   that is by sharing their *real* P&L."  *Id.*  He states "I am not [here to judge Heitkoetter] . . . I am

27

28

16

1    here to state the facts and let you be the judge." *Id.*  He then says "Markus has claimed to be a

2    successful and transparent trader and educator . . . let's see what he said on his Youtube channel,"

3    before showing various clips of Heitkoetter stating that it is realistic for a trader to make between

4    60% and 800% per year trading.  Immediately after those clips, defendant states "[w]ell, I

5    subpoenaed [Heitkoetter's] trading records." *Id.*  Defendant then states that, after adding all the

6    realized and unrealized profits and losses, Heitkoetter lost approximately $3,600 over the three-

7    year period. *Id.*  Defendant says to the audience, "You can be the judge.  Did [Heitkoetter] make

8    60 or 100 or 500 or 800 percent per year?  Does he make enough to trade for a living?" *Id.*

9    Given this context, a reasonable trier of fact could conclude that defendant intended to imply with

10   the thumbnail "busted" that he had, in fact, caught plaintiffs in a lie about their trading success.

11   *See Milkovich*, 497 U.S. at 21.

12       The cases defendant cites to support his argument do not help him to establish that the

13   term busted is inactionable rhetorical hyperbole.  *See* Doc. 136-1 at 10.  In those cases, unlike

14   here, the plaintiffs argued that the statements made about them had literal meanings that were

15   allegedly defamatory (in those cases, they were either criminal in nature or indicated mental

16   illness), and the courts in those cases found that no reasonable person would understand such

17   remarks or depictions to indicate that the defendants were claiming that the plaintiffs had literally

18   committed those crimes or were mentally ill.  *See Fletcher v. San Jose Mercury News*, 264 Cal.

19   Rptr. 699 (Cal. App. Ct. 1989) (newspaper reporter stated plaintiff was "a crook and a crooked

20   politician"); *McGlothlin v. Hennelly*, 370 F. Supp. 3d 603, 618 (D.S.C. 2019) (defendant called

21   plaintiff a "crony capitalist," a "crook," and a "crooked owner"); *Greenbelt Co-op. Pub. Ass'n v.*

22   *Bresler*, 398 U.S. 6 (1970) (party's negotiating position was described as "blackmail"); *Clifford v.*

23   *Trump*, 818 Fed. App'x 746 (9th Cir. 2020) (defendant called plaintiff a "con job"); *Yorty v.*

24   *Chandler*, 91 Cal. Rptr. 709 (Cal. App. Ct. 1970) (cartoon depicted plaintiff running for political

25   office with doctors holding a strait jacket).  Here, unlike those cases, plaintiffs do not allege that

26   there is a separate literal meaning of "busted" that is defamatory apart from the arguable intended

27   meaning.  Rather, plaintiffs allege that "busted" is defamatory because a reasonable viewer would

28   understand it to mean exactly what they allege defendant intended it to mean—that is, that

1  plaintiffs lied about their investment performance and defendant caught them in that lie.[16]

2  Moreover, whether Heitkoetter's investment performance was not as good as he claimed,

3  and whether he lied about his investment performance, are capable of being proven true or false.

4  *See Milkovich*, 497 U.S. at 21.  A finder of fact could compare Heitkoetter's claims regarding his

5  investment performance against his actual investment performance to determine whether his

6  claims were in fact untruthful.  The busted thumbnail is therefore not inactionable as rhetorical

7  hyperbole.

8  Finally, defendant contends that plaintiffs have not produced *any* evidence supporting the

9  third element of their claim for defamation by implication—that is, that the challenged

10  implications that Heitkoetter's investment performance was not as good as he claimed for the

11  years at issue and that he lied about his investment performance to sell his trading products are

12  not substantially true.  *See Celotex Corp.*, 477 U.S. at 322–23 (summary judgment proper where

13  party with burden of proof at trial, after adequate time for discovery, "fails to make a showing

14  sufficient to establish the existence of an element essential to that party's case").

15  Plaintiffs point to Domm's deposition testimony and Heitkoetter's deposition testimony.

16  Doc. 143 at 22–23.  Specifically, plaintiffs point to a portion of Domm's deposition, in he was

17  asked "Based on your review of the account statement, did Markus [Heitkoetter] realize a profit

18  in 2021 using the wheel strategy?" and Domm responded "That's one quarter of the P&L, yes."

19  *Id.* (citing April 10, 2024 Domm Dep. 149:4–6).  They also point to Heitkoetter's deposition

20  testimony in which he discusses his *realized* profits.  *Id.* at 23 (citing July 19, 2024 Heitkoetter

21  Dep. 239:10–13).  But the implication that Heitkoetter's investment performance was not as good

22  as he claimed it was for the years at issue rests on the contention that plaintiffs misleadingly did

23  not share their *unrealized losses* on the relevant accounts, and that when such unrealized losses

---

[16] Defendant's argument that "busted" constitutes rhetorical hyperbole because the Cambridge dictionary's definition of "busted" is "to break, surge or burst" is unavailing for obvious reasons. Doc. 136-1 at 10.  Clearly plaintiffs' defamation by implication claim is not based on the contention that a reasonable viewer would have understood the "busted" thumbnail to mean that plaintiffs had "broken, surged, or burst."  Rather, as plaintiffs note in their opposition, their claim is based on the other definition of busted: that is, that defendant caught plaintiffs doing something wrong.  *See* Doc. 143 at 23.

1    were considered, the trading accounts actually had negative value.

2            However, plaintiffs also point to testimony from Heitkoetter that, in the Trading

3    Statements Video, defendant "tries to . . . confuse people about the realized profits and the net

4    liquidation value," which "[Heitkoetter] [does not] believe is representative of how successful an

5    account is." *Id.* (citing July 19, 2024 Heitkoetter Dep. 239:10–13, 261:18–262:3).  Rather, "[he]

6    believe[s] [the best representation of an account's success [is] the [account's] realized profit and

7    loss." *Id.*[17]

8            Viewed in the light most favorable to plaintiffs, as the Court must on summary judgment,

9    in theory a trier of fact could credit Heitkoetter's testimony regarding his purported belief that the

10   reasonable valuation of the success of an account is the account's realized profits and losses

11   (rather than the account's net liquidation value).  On the other hand, at trial it could be determined

12   that Heitkoetter's claimed belief was not credible, that he unreasonably referred only to his

13   "realized" profits and losses in plaintiffs' Youtube videos, and that his failure to include

14   unrealized losses was misleadingly deceptive, and that he was dishonest about his trading

15   accounts' success.  The determination of these issues depends at least in part on a credibility

16   assessment to be made at trial.  It is therefore a trial issue whether the allegedly defamatory

17   inference that Heitkoetter lied about how successful his trading accounts were during the relevant

18   years is "substantially true."

19           Accordingly, defendant's motion for summary judgment is denied as to plaintiffs' claims

20   for defamation by implication and related claims for intentional interference with prospective

21   economic advantage and deceptive trade practice.

22                   **3.  Abuse of Process Claim**

23           Defendant also moves for summary judgment on plaintiffs' abuse of process claim.

24   Doc. 136-1 at 12–15.  "The common law tort of abuse of process arises when one uses the court's

25

26   ─────────────────────
     [17] Plaintiffs also argue that the TAC "clearly sets out why the allegations . . . are defamatory and
27   false," Doc. 143 at 24 (citing TAC ¶¶ 29–69), but the unverified TAC is not evidence and cannot
     help plaintiffs to meet their burden of putting forth evidence in support of an essential element of
28   their claim.  *See, e.g.*, *Moran v. Selig*, 447 F.3d 748, 459–60 (9th Cir. 2006) (complaint not
     considered as evidence at summary judgment stage when unverified).

1    process for a purpose other than that for which the process was designed." *JSJ Ltd. P'ship v.*

2    *Mehrban*, 141 Cal. Rptr. 3d 338, 345 (Cal. App. Ct. 2012) (citation omitted). "To succeed in an

3    action for abuse of process, a litigant must establish that the defendant (1) contemplated an

4    ulterior motive in using the process, and (2) committed a willful act in the use of the process not

5    proper in the regular conduct of the proceedings." *Id.*

6         To prevail on an abuse of process claim, there must be "[s]ome definite act or threat not

7    authorized by the process" or the use of process must be done in an "unauthorized manner."

8    *Silver v. Gold*, 259 Cal. Rptr. 185, 189 (Cal. Ct. App. 1989). In other words, "[m]erely obtaining

9    or seeking process is not enough; there must be *subsequent abuse*, by a misuse of the judicial

10   process for a purpose other than that which it was intended to serve." *Adams v. Superior Court*, 3

11   Cal. Rptr. 2d 49, 53 (Cal. App. Ct. 1992) (emphasis added); *see also Tellefsen v. Key System*

12   *Transit Lines*, 17 Cal. Rptr. 919, 922 (Cal. App. Ct. 1961) (there is no cause of action for abuse of

13   process where a party has "done nothing more than carr[ied] out the process to its authorized

14   conclusion" even if done with "bad intentions"). For this reason, courts have consistently held

15   that "[t]he mere filing or maintenance of a lawsuit [without an additional act that could be

16   considered misuse]—even for an improper purpose—is not a proper basis for an abuse of process

17   action." *See, e.g.*, *Silver*, 259 Cal. Rptr. at 189; *see also Tellefsen*, 17 Cal. Rptr. at 615 (holding

18   that merely filing an appeal with a "bad motive" but without an additional act does not give rise

19   to abuse of process claim but noting that filing an appeal, with an act further using that process,

20   could).

21        Here, plaintiffs' abuse of process claim is based on the contention that defendant had an

22   improper purpose for filing the counterclaim—namely to be able to circumvent the protective

23   order and publicly publish information on Youtube about plaintiffs that defendant obtained

24   through discovery. *See* TAC; *see also* Doc. 143 at 25–29. Plaintiffs have put forth evidence that

25   could raise an inference that defendant had an ulterior motive in filing the counterclaim, including

26   that in the Counterclaim Video defendant notes dissatisfaction with the protective order and noted

27   that he is still permitted to share anything on Youtube that is part of the public record (which

28   would include the counterclaim). Plaintiffs argue that defendants posting of the Counterclaim

1    Video could potentially constitute the sufficient "subsequent abuse" of a court process necessary

2    to maintain an abuse of process claim. *Adams*, 3 Cal. Rptr. 2d at 53; *see also Tellefsen*, 17 Cal.

3    Rptr. at 615.

4    However, the magistrate judge, who issued the relevant order, held that discussing and

5    reading the counterclaim in the Youtube video (and therefore any discovery information within

6    the counterclaim) was privileged under the litigation privilege and the fair and true report

7    privilege. Doc. 86 at 22–23. On that basis, the plaintiffs' claims regarding defendant's

8    discussion of his counterclaim in the Counterclaim Video (that is, from timestamp 5:50–17:55)

9    were dismissed without leave to amend. *Id.*

10   Where the litigation privilege or the fair and true report privilege applies, "the statement is

11   absolutely privileged," *see Hawran v. Hixson*, 147 Cal. Rptr. 3d 88, 109 (Cal App. Ct. 2012), and

12   a statement is not actionable if it is privileged, *Francis v. Dun & Bradstreet, Inc.*, 4 Cal. Rptr. 2d

13   at 364 (Cal. Ct. App. 1992). Thus, plaintiffs cannot proceed on their abuse of process claim for

14   defendant's filing of the counterclaim and subsequent public discussion of the counterclaim in the

15   Counterclaim Video.

16   Plaintiffs oppose summary judgment on this claim solely based on the assertion that

17   defendant can be held liable for abuse of process for filing the counterclaim and repeating its

18   claims in the Counterclaim Video. *See* Doc. 143 at 25–29. The magistrate judge found that the

19   portion of the Counterclaim Video in which defendant discusses the counterclaim is privileged.

20   Therefore, it is not actionable.[18]

21   _____

22   [18] To the extent the prior order held that the abuse of process claim could proceed based on the defendant's publishing in the Counterclaim Video of the tax lien, the mechanic's lien, and the

23   civil case in Ohio accusing Heitkoetter of fraud, *see* Doc. 86 at 26 (citing the Counterclaim Video from timestamp 3:57–5:49), that was in error, as those documents are not mentioned in the

24   counterclaim and cannot form the basis for an abuse of process claim based on the theory that defendant filed the counterclaim for the purpose of being able to make discovery information

25   public by putting it within the counterclaim. *See, e.g.*, *United States v. Smith*, 389 F.3d 944, 949

26   (9th Cir. 2004) (a district court may reconsider its own rulings at any time prior to entry of final judgment). Moreover, defendant notes in his reply that he did not obtain these documents

27   through discovery but rather through his own investigation, Doc. 150 at 11, and plaintiffs have not set forth any evidence to the contrary.

28

21

1    For these reasons, defendant's motion for summary judgment as to plaintiffs' abuse of

2    process claim is granted.

3    **B.   Plaintiffs' Motion to Strike Expert Testimony and Report**

4    Plaintiffs move to exclude the testimony, report, and consumer survey of defendant's

5    consumer survey report expert, Travis Tae Oh, Ph.D., pursuant to Federal Rules of Evidence 702

6    and 403 on the basis that the consumer survey was "so methodologically flawed" as to render the

7    report and Dr. Oh's testimony unreliable and irrelevant in answering the question of how

8    consumers understood the two allegedly misleading statements made by plaintiffs.[19]  Doc. 137-1;

9    Doc. 147 at 2.

10    Federal Rule of Evidence 702 requires expert testimony to be "both relevant and reliable

11    to be admissible." *BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269, 1275 (9th Cir. 2024)

12    (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  "Survey evidence . . .

13    should be admitted as long as it is conducted according to accepted principles and is relevant."

14    *Id.* (cleaned up).  "Technical inadequacies in a survey, including the format of the questions or the

15    manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Id.*

16    (cleaned up).  "[F]ollow-on issues of methodology, survey design, reliability, the experience and

17    reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather

18    than its admissibility." *Id.*  "The admissibility threshold for survey evidence in the Ninth Circuit

19    is notably low."  *See, e.g.*, *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, Case No. 16-cv-3059-

20    BAS-AGS, 2019 WL 5328730 (S.D. Cal. Oct. 21, 2019) (citation omitted) (collecting cases).

21    Plaintiffs take issue with various aspects of the consumer survey, including that Dr. Oh

22    wrote the survey by reviewing the counterclaim allegations regarding the allegedly misleading

23    statements rather than the actual advertisements where the allegedly misleading statements

24    appear; that the universe of participants surveyed is too broad; that the survey does not mimic

25    marketplace conditions for various reasons, including that the survey questions are text only and

26

27    [19] Defendant's counterclaim is based on the contention that plaintiffs made four false statements
and two misleading statements.  *See* Doc. 46 ¶¶ 26–28, 39, 98, 100.  Only the two misleading

28    statements are at issue for purposes of plaintiffs' motion to strike.  Doc. 137-1 at 3.

1    exclude "contextual information" about the advertisements, one of the allegedly misleading

2    statements is paraphrased rather than repeated verbatim, and the survey asks participants about

3    both allegedly misleading statements when there is no evidence a consumer would see both

4    advertisements; and that the survey introduces bias, including by stating external facts about the

5    success of top hedge fund managers, by using terms (such as "margin call" and "unrealized

6    losses") which Dr. Oh expected would not be understood by some of the participants, and by

7    asking leading questions—namely, directly asking participants whether the allegedly misleading

8    statements were "misleading" rather than eliciting a response on this topic in another way.  *See*

9    *generally* Docs. 137-1, 147.[20]

10          Though plaintiffs complain that Dr. Oh wrote the survey without viewing the Youtube

11    video or the web page in which the two allegedly misleading statements appear, they provide no

12    evidence to support a finding that this would automatically render the survey invalid "according

13    to accepted principles."  *BillFloat Inc.*, 105 F.4th at 1275.  As for plaintiffs' claim that the

14    universe of participants was overbroad, the Ninth Circuit has held that arguments that the

15    universe of survey participants is over- or under-inclusive is a challenge to a survey's

16    "methodology and design" and "is precisely the kind of claimed deficienc[y] that goes to the

17    weight of the evidence, not its admissibility."  *Id.*  The Ninth Circuit has also held that arguments

18    that a survey failed to replicate "real world conditions" or "may have been suggestive" also "go to

19    issues of methodology, survey design, reliability, [and] critique of conclusions" and not to

20    admissibility.  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d

21    1025, 1037 (9th Cir. 2010) (cleaned up) (finding district court erred in excluding consumer

22    survey report despite the survey having "a number of shortcomings"); *see also Quidel Corp.*,

23    2019 WL 5328730, at *4 ("bulk of cases [in Ninth Circuit] hold that an objection regarding the

24    phrasing of survey questions and the use of potentially ambiguous terms is one that falls into the

25    _____

26    [20] Plaintiffs nearly exclusively cite out of circuit law in support of their position that such claimed
      deficiencies render the survey inadmissible.  *See generally* Docs. 137-1, 147.  Other circuits have

27    different standards regarding the admissibility of consumer surveys, and plaintiffs largely fail to
      address applicable Ninth Circuit law.

28

1    category of 'survey design'" and not to admissibility).

2    　　　In short, under Ninth Circuit precedent, plaintiffs' numerous issues with the consumer

3    survey relate to the survey's format, methodology, and design—not to whether the survey was

4    conducted according to accepted principles—and therefore, such claimed deficiencies go to the

5    weight of the survey as evidence, rather than the survey's admissibility.[21]  *See BillFloat Inc.*, 105

6    F.4th at 1275; *see also Fortune Dynamic, Inc.*, 618 F.3d at 1037.  Plaintiffs may, of course, argue

7    at trial the appropriate weight to be accorded to Dr. Oh's survey.  *See BillFloat Inc.*, 105 F.4th

8    at 1276.

9    　　　This conclusion is further underscored by the fact that the parties have elected to try this

10    case as a bench trial.  *See United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) ("*Daubert*

11    is meant to protect *juries* from being swayed by dubious scientific testimony. When the district

12    court sits as the finder of fact, there is less need for the gatekeeper to keep the gate when the

13    gatekeeper is keeping the gate only for himself.") (emphasis in original); see also *FTC v.*

14    *BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) ("[T]here is less danger that a trial court will

15    be 'unduly impressed by the expert's testimony or opinion' in a bench trial [as opposed to a jury

16    in a jury trial].").

17    　　　For the foregoing reasons, plaintiffs' motion to exclude Dr. Oh's consumer report and

18    testimony, Doc. 137, is denied.

19    ───────────────

20    [21] Additionally, plaintiffs acknowledge that they do not challenge Dr. Oh's qualifications to
administer consumer reports.  Doc. 137-1 at 7 n.6.  Dr. Oh's survey report states that he is "an

21    expert on experimental and survey research, having completed hundreds of survey-based projects
throughout his career."  Doc. 142-2 at 37.  The report also explains that the survey included

22    "prescreening question[s] to retain qualified individuals" who had experience investing in the
stock market and had some interest in the stock market in the last six years, used a sample size of

23    more than 300 participants "[t]o provide sufficient statistical power," showed each question on a
separate page as is "best practice[]" to not "bias responses," included open ended responses to

24    allow for elaboration as needed, used a "seven-point Likert scale" to measure consumer intent and
attitudes as that scale "has been shown to be most effective for bipolar measures," and provided

25    categorical choices for interpretations and opinions which included "don't know / unsure" options
"to minimize any noise that may arise due to lack of comprehension."  *Id.* at 37–38.  Plaintiffs do

26    not argue that conducting a survey according to these guidelines defy accepted principles of

27    conducting consumer report surveys, nor do they argue that Dr. Oh neglected to incorporate a
principle or metric that would have been required to perform this type of survey.  *See generally*

28    Doc. 137-1, 147.

**C.  Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaim**

Plaintiffs move for summary judgment on defendant's counterclaim, arguing that defendant has not proven that there is a triable issue of fact for several elements of defendant's Lanham Act claim for false advertising.  Plaintiffs further argue that, because they are entitled to summary judgment on defendant's Lanham Act claims, they are also entitled to summary judgment on defendant's claims under the UCL.  *Id.* at 29–30; *see also, e.g.*, *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (explaining that UCL claims are "substantially congruent" to Lanham Act claims).

To prevail on his false advertising claim under the Lanham Act, defendant must show: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products."  *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

Plaintiffs mainly argue that defendant has failed to demonstrate there is a triable issue of fact as to injury, but they also briefly set forth arguments regarding falsity, deception, and materiality.  *See generally* Doc. 138-1.  Because there are triable issues of fact as to all elements, summary judgment is denied.

A statement can be a "false statement" for purposes of element one if it is "literally false, either on its face or by necessary implication" or if it is "literally true but likely to mislead or confuse consumers."  *See, e.g.*, *Southland*, 108 F.3d at 1139.  "Where a statement is literally false or intentionally misleading, deception may be presumed."  *Simpson Strong-Tie Co. v. MiTek Inc.*, 2023 WL 8697700 (N.D. Cal. Dec. 15, 2023) (citations omitted).  Plaintiffs argue that defendant cannot establish that the four allegedly false statements are literally false, to support element one, because they are non-actionable opinion or "puffery."  Doc. 138-1 at 23–25.  As to the two

1    allegedly misleading statements, plaintiffs argue that defendant cannot establish that the

2    statements actually deceived or have the tendency to deceive their intended audience.  Doc. 138-1

3    at 15–18.

4           "A statement is considered puffery if the claim is extremely unlikely to induce consumer

5    reliance."  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008); *see also*

6    *Southland*, 108 F.3d at 1145 ("Puffing is exaggerated advertising, blustering, and boasting upon

7    which no reasonable buyer would rely").  "Ultimately, the difference between a statement of fact

8    and mere puffery rests in the specificity or generality of the claim."  *Newcal Indus.*, 513 F.3d at

9    1053.  Therefore, "a general, subjective claim" is "non-actionable puffery" but "a statement that

10   is quantifiable" or "makes a claim as to the 'specific or absolute characteristics of a product'"

11   may be actionable.  *Id.*; *see also Southland*, 108 F.3d at 1145 ("vague" or "highly subjective"

12   claims are nonactionable puffery but "specific and measurable" claims are not).  Whether a

13   statement or inference that can be drawn from a statement can be proven true or false is relevant

14   to determining if the statement is a factual statement or mere puffery.  *Newcal Indus.*, 513 F.3d

15   at 1053–54.  Additionally, if the advertisement explains the "basis for the claim," it is less likely

16   to be puffery.  *Southland*, 108 F.3d at 1145.

17          Here, the four allegedly false statements are factual statements, not general, vague, or

18   subjective assertions.  They are specific, quantifiable, and capable of being proven true or false.

19   Additionally, the advertisements provide bases for the claims—namely plaintiffs' own knowledge

20   about their trading success and calculations regarding why certain expectations for consumers

21   regarding their potential trading success are reasonable.  Importantly, given all of this, they are

22   the type of statements that would be likely to induce consumer reliance.

23          Plaintiffs argue that "when viewed in context," it is clear that the four allegedly false

24   statements are non-actionable opinion and puffery.  Doc. 138-1 at 24–25.  However, a review of

25   the context in which the statements appear demonstrates the opposite.  The first allegedly false

26   statement is "Based on my [that is, Heitkoetter's] experience, whether you are trading stocks,

27   options, or futures, it doesn't really matter, realistically, you can expect 60%."  Doc. 141-3 ¶ 51.

28   This statement was made in a Youtube video entitled "How Much Money Can I Make Day

26

Trading." *Id.*   He further explains in the video why he thinks this figure is reasonable, specifying that it is reasonable to make 5% a month.  *Id.*; Doc. 138-1 at 24.

Alleged false statement two is a response to a question a potential consumer raised on plaintiffs' Youtube video titled "Trading for a living: How much money do you need to trade for a living?"  Doc. 143-1 ¶ 64.  The comment asked plaintiffs, "Do you think it's possible to make a 5% return each week off of $100k stock account[?]" and plaintiffs replied "Possible? – Yes, Realistic? – No.  I [that is, Heitkoetter] have been trading for many many years, and I'm making between 60%–80% per year, i.e. 1%– 1.5% per week."  *Id.* ¶¶ 64–65.  This statement specifies plaintiffs' alleged success in trading and implies what could be "realistic" for the potential consumer to expect to make by trading per year.  Similarly, alleged false statement three is "I [that is, Heitkoetter] personally get around 60% a year," and the statement was posted on plaintiffs' website, where plaintiffs' market and sell their products.  *Id.* ¶ 73.

The fourth alleged false statement is: "usually I'm [that is, Heitkoetter] between one hundred and one hundred and twenty percent," and the context of this statement is that it was made in a Youtube video titled "Why Do I Keep Losing Money in the Stock Market," which appears to have been intended to attract potential consumers who were seeking guidance on avoiding losing money in the stock market.  *Id.* ¶ 78.  Heitkoetter made this statement after stating that he had secured 45% in returns over the preceding three months (which would an annualized rate of 180% a year), and he indicated this was unusually high because he usually makes between 100% and 120% per year.  *Id.* ¶ 79.  Contrary to plaintiffs' assertion, Doc. 138-1 at 25, this context would appear to make a consumer more likely, rather than less likely, to rely on plaintiffs' representation that he usually secures between 100 and 120% profits annually from trading.

Plaintiffs also contend that these statements are not the kind that could cause consumer reliance because they do not specifically mention plaintiffs' products or services.  *See, e.g.*, *id.* at 24.  In essence, plaintiffs argue there can be no cause of action because the statements do not explicitly tell consumers that if they use one of plaintiffs' specific products or services, they too will make 60% per year.  *See, e.g.*, *id.*  This argument falls flat.  First, plaintiffs do not challenge

1    for purposes of this motion that all the statements were made in commercial advertisements for

2    plaintiffs' services and products.  *Id.* at 15 n.5.  Plaintiffs have also stated that their main form of

3    advertising is their Youtube videos.  Doc. 141-4 ¶ 20.  A reasonable inference from the allegedly

4    false statements, which were made in the context of advertisements to sell plaintiffs' services and

5    products, is that if consumers use plaintiffs' products, services, and expertise, they too can be as

6    successful as Heitkoetter claims to be and can expect at least a 60% annual return.

7          There is also a triable issue of fact regarding whether the two allegedly misleading

8    statements have a tendency to deceive a substantial segment of their intended audience.

9    Plaintiffs' argument that defendant has not proffered any admissible evidence in support of this

10   element rests on their motion to exclude Dr. Oh's survey, report, and testimony regarding the

11   allegedly misleading statements.  Doc. 138-1 at 17–18; Doc. 148 at 11.  However, as noted above,

12   plaintiffs' motion to exclude the report is denied.  Given that Dr. Oh concluded that the two

13   misleading statements were likely to mislead consumers, Doc. 141-2 at 18, defendant has shown

14   there is a triable issue of fact as to whether the allegedly misleading statements have a tendency to

15   deceive consumers.

16         Plaintiffs further argue that there is no triable fact as to materiality as to any of the six

17   statements.  Doc. 138-1 at 18–19, 25–28.  Materiality refers to whether the alleged deception "is

18   likely to influence the [consumer's] purchasing decision."  *See, e.g.*, *Southland*, 108 F.3d at 1139.

19   Each of the six alleged statements were made on plaintiffs' website (where they sell and market

20   their services and products) or on their Youtube channel (which plaintiffs have stated is their

21   primary method of advertising their services and products) and relates to plaintiffs' alleged

22   success as a trader.  *See* Doc. 141-4 ¶ 20.  "[M]ateriality in false advertising claims is 'typically'

23   proven through consumer surveys."  *Skydive Arizona Inc. v. Quattrocchi*, 673 F.3d 1105, 1110–

24   11 (9th Cir. 2021) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th

25   Cir. 1997)).  Here, defendant points to Dr. Oh's survey and expert report, which found that the

26   ability of a trader to make a profit from trading is "extremely" or "very important" to a large

27   majority of survey participants in deciding whether to purchase products or services from that

28   trader.  Doc. 141 at 4–5, 11.  The survey results further indicated that a majority of participants

1    would be interested in purchasing from a trader who claimed to make profits of sixty percent after

2    being informed that hedge fund managers typically make between seven to sixteen percent. *Id.*

3    at 13. Thus, defendant has met its burden to put forth evidence showing there is a triable issue of

4    fact regarding the materiality of the alleged deception.[22]

5        Finally, plaintiffs argue that defendant has not shown a triable fact as to injury. Doc. 138-

6    1 at 14, 19–22, 28–29. To prevail under the "Lanham Act's cause of action for false advertising, a

7    plaintiff must . . . prove an injury to a commercial interest in sales or business reputation

8    proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control

9    Components, Inc.*, 572 U.S. 118, 140 (2014) (cleaned up).

10       Defendant asserts that plaintiffs' allegedly false claims of making 60% or more a year by

11   trading injures defendant, because defendant's average return from trading is 17%, and he cannot

12   compete with plaintiffs' claims. Doc. 141 at 15. In further support of his claimed injury, he

13   points to Dr. Oh's consumer survey, in which participants were presented with the information

14   that top hedge fund managers typically make between 8 and 16% a year and more than half of the

15   participants reported that they would be interested in purchasing products from a trader who

16   claimed to make 60% or more a year. *Id.* at 15–16. Defendant argues that, for these reasons, he

17   will likely suffer injury in the future (presumably lost profits) and that he has suffered actual

18   damages by spending money for corrective advertising to inform potential consumers of the

19   falsity of plaintiffs' advertisements. Doc. 141 at 14–16.

20       Courts "generally presume[] commercial injury when [the parties] are direct competitors

21   and [one]'s misrepresentation [about one's products] has a tendency to mislead consumers."

22   *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 826–27 (9th Cir. 2011) (citation omitted);

23   *see also ThermoLife Int'l, LLC v. BPI Sports, LLC*, No. 21-15339, 2022 WL 612669, at *2 (9th

24   Cir. Mar. 2, 2022) (citing *TrafficSchool.com* for the same proposition). This is because

---

26   [22] Plaintiffs object to defendant's reliance on an FTC complaint to show a triable issue of fact as
27   to deception and materiality as inadmissible hearsay. Doc. 148 at 7. Because the Court does not
     rely on the FTC complaint for purposes of this finding, this Order need not address plaintiffs'
     evidentiary objection.

28

1   "[c]ompetitors vie for the same dollars from the same consumer group, and a misleading ad can

2   upset their relative competitive positions." *TrafficSchool.com*, 653 F.3d at 827.  That is, where a

3   party "advertised a different (and allegedly better) product than [it] delivered," such

4   advertisements necessarily affect its competitors because they "draw[]" consumers to it and away

5   from its competitors.  *Id.*

6          In *TrafficSchool.com*, the parties were direct competitors, and the plaintiffs alleged that

7   the defendant had made advertisements about defendant's own products that were false.  *Id.*

8   at 824–26.  The Ninth Circuit upheld the district court's decision that the plaintiffs had shown that

9   the defendant violated the Lanham Act, and specifically that plaintiffs had shown an injury,

10  because such circumstances gave rise to a presumption of commercial injury.  *Id.* at 826–27, 829.

11  The Ninth Circuit further upheld the district court's decision that, despite a finding of commercial

12  injury, an award of *lost profits* was inappropriate, because, without evidence of actual injury and

13  causation, it would be impossible "to determine with any degree of certainty what award would

14  be compensatory."  *Id.* at 831 (emphasis added).  This result naturally flowed from the fact that

15  "when advertising does not directly compare [the parties'] products," the injury to a party from

16  the other party's false advertising "may be a small fraction of the [advertiser's] sales" given the

17  number of other competitors in the market.  *Id.*  However, the court found that appropriately

18  tailored injunctive relief may be appropriate to prevent future injury.  *Id.* at 829–31.

19         Here, like in *TrafficSchool.com*, the parties admit that they are competitors and that there

20  are many competitors in the market, defendant alleges that plaintiffs made false advertising

21  statements regarding plaintiffs' own products and services, and as already noted above, there are

22  triable issues of fact regarding whether plaintiffs' statements are false and have a tendency to

23  mislead consumers.  Thus, the presumption of commercial injury applies here, and defendant's

24  claims for damages for corrective advertising and for injunctive relief should proceed.  *See*

25  *generally TrafficSchool.com*, 653 F.3d 820; *see also Lexmark*, 572 U.S. at 135 (citing

26  *TrafficSchool.com* approvingly for the proposition that "[e]ven when a [party] cannot quantify its

27  losses with sufficient certainty to recover damages, it may still be entitled to injunctive relief . . .

28

1    assuming it can prove a likelihood of future injury").[23]

2         Plaintiffs' contention that they are entitled to summary judgment because defendant has

3    not adequately shown that he suffered $750 in damages to publish corrective advertising, because

4    the $750 receipt does not state exactly what was purchased or that defendant purchased it, is

5    similarly unavailing.  This misstates defendants' burden to survive summary judgment.  He does

6    not need to *prove* that he suffered $750 in damages at this juncture; he needs only put forth

7    evidence to show that there is a triable issue of fact as to whether he was injured and suffered

8    damages.  *See Kingsbury v. U.S. Greenfiber, LLC*, Case No. CV 08-00151 DSF (AGRx), 2013

9    WL 12114860, at *5 (C.D. Cal. Nov. 4, 2013) (citing *Silgan Containers, LLC v. Nat'l Union Fire*

10   *Ins. Co. of Pittsburgh, Pa.*, 543 Fed App'x 635 (9th Cir. 2013)) (finding claiming party did not

11   need to put forth admissible calculation regarding amount of damages to survive summary

12   judgment).  As noted above, defendant has adequately shown injury.  He also testified that he

13   paid to publish corrective advertising.  April 10, 2024 Domm Dep. 174:12–22, 177:21–178:19.

14   Thus, he has met his burden to survive summary judgment.  Further, for the reason discussed

15   above, whether defendant ultimately can prove that he suffered $750 in damages for corrective

16   advertising has no effect on defendant's ability to proceed in this case for injunctive relief.

17        For these reasons, summary judgment on defendant's false advertising claim under the

18   Lanham Act is denied.  Because plaintiffs are not entitled to summary judgment on the Lanham

19   Act claim, plaintiffs' motion for summary judgment on the UCL claim is also denied.

20   ///

21   ///

22

23   [23] Plaintiffs' argument that there can be no presumption of injury to defendant from the allegedly
     false advertising, because the parties agree that plaintiffs' statements did not constitute
24   comparative advertising, is unavailing.  Doc. 138-1 at 14.  As noted, *TrafficSchool.com* held that
     where the claim is not based on comparative advertising, a damages award of *lost profits* would
25   not be appropriate because the amount of lost profits would be too speculative without further
     proof of actual damages.  653 F.3d at 831 ("in false comparative advertising cases . . . it's
26   reasonable to presume that every dollar [the false comparative advertiser] makes has come
     directly out of [the other]'s pocket" but the same is not true for non-comparative advertising
27   cases).  However, as noted, here defendant does not seek an award of past lost profits; rather, he
     seeks damages for the cost of corrective advertising and an injunction to prevent future harm.
28

1  **IV.    CONCLUSION**

2         For the foregoing reasons,

3              1.  Defendant's motion for partial summary judgment on plaintiffs' TAC,

4                  Doc. 136, is granted in part and denied in part as follows:

5                       i.  Granted as to plaintiffs' abuse of process claim; and

6                       ii. Denied in all other respects;

7              2.  Plaintiffs' motion to strike the expert testimony and report of defendant's

8                  expert, Travis Tae Oh, Ph.D., Doc. 137, is denied; and

9              3.  Plaintiffs' motion for summary judgment on defendant's counterclaim,

10                 Doc. 138, is denied.

11

12

13  IT IS SO ORDERED.

14    Dated:   August 16, 2025

15                                              UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28